Savino **DAGNELLO**, Plaintiff-Appellee,

v.

**LONG ISLAND RAIL ROAD COMPANY**, Defendant-Appellant.

No. 173, Docket 26453.

United States Court of Appeals Second Circuit.

Argued Jan. 17, 1961.

Decided March 24, 1961.

| | | |
|---|---|---:|
| 1. | Loss of salary to date...... | $ 10,000 |
| 2. | Compensation for amount of salary he may forego because of injury—$38,000 at 4½%, $1710 per year...... | 38,000 |
| 3. | Compensation for pain and suffering and loss of limb.. | 97,000 |
| | Total Settlement........ | $145,000 |
| | Less 10%............... | 14,500 |
| | | $130,500 |

The only point argued before us is that the trial judge abused his discretion in refusing to order a new trial, or direct a remittitur, on the sole ground that the $97,000 awarded for "pain and suffering and loss of limb" was too high.

*In limine* appellee challenges our power to consider this question. Moreover, the facts of this case are such as to present the problem in its simplest form. The atmosphere of the trial was precisely what it should have been. There were no incidents, or appeals to prejudice or passion to play upon the sympathy of the jury. The evidence was amply sufficient to warrant a finding of liability. If there was any abuse of discretion in the refusal of the trial judge to set aside the verdict, it was solely because the amount of the verdict was too high. But appellee argues that, in the absence of some erroneous ruling on matters of evidence or in the instructions to the jury, or some indication that the trial judge thought he lacked power to set aside the verdict for excessiveness, or something to show that the verdict was the result of passion or prejudice or bias on the part of the jury, we lack power to review the alleged abuse of discretion by the trial judge in refusing to set aside the verdict for mere excessiveness. Appellee insists that our power of review is limited to questions of law and that, if we were to hold it was an abuse of discretion to refuse to set aside the verdict, we would be deciding a question of fact, or "personal discretion," and not a question of law, in violation of the Seventh Amendment.

While the intermediate appellate courts of the States and in most instances the State courts of last resort

William F. McNulty, New York City (William J. O'Brien, New York City, and Otto M. Buerger, Jamaica, N. Y., on the brief), for defendant-appellant.

Arnold B. Elkind, New York City (Irwin R. Karassik and Zelenko & Elkind, New York City, on the brief), for plaintiff-appellee.

Before MEDINA, FRIENDLY and SMITH, Circuit Judges.

MEDINA, Circuit Judge.

On March 26, 1959 Savino Dagnello, a yard brakeman in the employ of appellant Long Island Rail Road Company had his left leg amputated when it was run over by two freight cars in the railroad's Pitkin Avenue Yard in Brooklyn, New York. Negligence on the part of the railroad was conceded, and the case went to the jury on the issues of contributory negligence and the amount of the damages to be assessed. The jury rendered a verdict against the railroad for $130,500. Although not requested to do so, the jury of its own volition, but closely following the various elements of damage discussed in Judge Weinfeld's charge, set forth the items of damage as follows, deducting 10% for contributory negligence:

have for many years exercised the power we are said to lack,[1] in the federal system the subject has been one of seemingly endless controversy. Our own decisions

1. In all but three of the fifty states either the highest court in the state or an intermediate appellate court has some power to review the size of a verdict for excessiveness.

Alabama: Florence Hotel Co. v. Bumpus, 1915, 194 Ala. 69, 69 So. 566.

Arizona: Allied Van Lines, Inc. v. Parsons, 1956, 80 Ariz. 88, 293 P.2d 430; Stallcup v. Rathbun, 1953, 76 Ariz. 63, 258 P.2d 821; Standard Oil Co. of California v. Shields, 1941, 58 Ariz. 239, 119 P.2d 116.

Arkansas: Pfeifers of Arkansas v. Rorex, 1956, 225 Ark. 840, 286 S.W.2d 1, 62 A.L.R.2d 1.

California: Murdrick v. Market Street Ry., 1938, 11 Cal.2d 724, 81 P.2d 950, 118 A.L.R. 533.

Colorado: Ark Valley Alfalfa Mills, Inc. v. Day, 1953, 128 Colo. 436, 263 P.2d 815; Kohut v. Boguslavsky, 1925, 78 Colo. 95, 239 P. 876.

Connecticut: Gorczyca v. New York, New Haven & Hartford R.R., 1954, 141 Conn. 701, 109 A.2d 589; Slabinski v. Dix, 1952, 138 Conn. 625, 88 A.2d 115.

Delaware: Bennett v. Barber, 1951, 7 Terry 132, 46 Del. 132, 79 A.2d 363.

Florida: Bartholf v. Baker, Fla.1954, 71 So.2d 480.

Georgia: Ga.Code, Section 105–2015; Kell v. Hunter, 1951, 84 Ga.App. 792, 67 S.E.2d 597.

Hawaii: Trask v. Kam, 1959, 44 Haw. 10, 56, 352 P.2d 320.

Idaho: Garrett v. Taylor, 1949, 69 Idaho 487, 210 P.2d 386.

Illinois: Smith v. Kroger Grocery & Baking Co., 1950, 339 Ill.App. 501, 90 N.E.2d 500, 20 A.L.R.2d 1.

Indiana: Larkins v. Kohlmeyer, 1951, 229 Ind. 391, 98 N.E.2d 896.

Iowa: Nichols v. Snyder, 1956, 247 Iowa 1302, 78 N.W.2d 836.

Kansas: Soden v. Bennett, 1952, 173 Kan. 142, 244 P.2d 1204.

Kentucky: Berio v. Talley, Ky.1954, 269 S.W.2d 185.

Louisiana: Moore v. Blanchard, 1949, 216 La. 253, 43 So.2d 599.

Maine: McMann v. Reliable Furniture Co., 1958, 153 Me. 383, 140 A.2d 736; Stinson v. Bridges, 1957, 152 Me. 306, 129 A.2d 203; Pearson v. Hanna, 1950, 145 Me. 379, 70 A.2d 247, 16 A.L.R.2d 1.

Massachusetts: Bartley v. Phillips, 1944, 317 Mass. 35, 57 N.E.2d 26.

Michigan: Vink v. House, 1953, 336 Mich. 292, 57 N.W.2d 887.

Minnesota: Romano v. Dibbs, 1959, 256 Minn. 332, 98 N.W.2d 146; Larson v. Degner, 1956, 248 Minn. 59, 78 N.W.2d 333.

Mississippi: Canale v. Jones, 1956, 228 Miss. 317, 87 So.2d 694.

Missouri: Price v. Nicholson, Mo.1960, 340 S.W.2d 1; Honeycutt v. Wabash R.R., Mo.1960, 337 S.W.2d 50.

Montana: McCartan v. Park Butte Theater Co., 1936, 103 Mont. 342, 62 P.2d 338.

Nebraska: Peetz v. Masek Auto Supply Co., 1956, 161 Neb. 588, 74 N.W.2d 474.

Nevada: Slack v. Schwartz, 1945, 63 Nev. 47, 161 P.2d 345.

New Hampshire: Hanlon v. Pomeroy, 1960, 102 N.H. 407, 157 A.2d 646.

New Jersey: Lindroth v. Christ Hospital, 1956, 21 N.J. 588, 123 A.2d 10; Fisch v. Manger, 1957, 24 N.J. 66, 130 A.2d 815, 823; Carlucci v. Stichman, 1958, 50 N.J.Super. 96, 141 A.2d 68.

New Mexico: Montgomery v. Vigil, 1958, 65 N.M. 107, 332 P.2d 1023; Jackson v. Southwestern Public Service Co., 1960, 66 N.M. 458, 349 P.2d 1029.

New York: Laranjo v. Malik, 3d Dep't. 1960, 11 A.D.2d 863, 203 N.Y.S.2d 139; Reich v. Evans, 3d Dep't.1958, 7 A.D. 2d 765, 180 N.Y.S.2d 159; Palmer v. Smith, 4th Dep't.1952, 280 App.Div. 1032, 117 N.Y.S.2d 188.

North Carolina: Evans v. Queen City Coach Co., 1959, 251 N.C. 324, 111 S.E. 2d 187; Hinton v. Cline, 1953, 238 N.C. 136, 76 S.E.2d 162.

North Dakota: Wolff v. Schlenker, 1948, 75 N.D. 645, 31 N.W.2d 793.

Ohio: Moore v. S. L. Grundstein & Sons, Inc., Ohio App.1952, 125 N.E.2d 742.

Oklahoma: Jones v. Eppler, Okl.1953, 266 P.2d 451, 48 A.L.R.2d 333.

Pennsylvania: Glaister v. Eazor Express, Inc., 1957, 390 Pa. 485, 136 A.2d 97; Kite v. Jones, 1957, 389 Pa. 339, 132 A.2d 683.

Rhode Island: Bernat v. De Gasparre, 1957, 85 R.I. 259, 129 A.2d 545; Keough v. Duggan, 1938, 59 R.I. 496, 196 A. 398.

South Carolina: Newman v. Brown, 1955, 228 S.C. 472, 90 S.E.2d 649, 55 A.L.R.2d 929.

South Dakota: Ross v. Foss, 1958, 77 S.D. 358, 92 N.W.2d 147.

Tennessee: Graham v. Smith, Tenn. App.1959, 330 S.W.2d 573.

Texas: Green v. Rudsenske, Tex.Civ. App.1959, 320 S.W.2d 228; Gulf, C. & S. F. Ry. Co. v. Shamburger, Tex.Civ. App.1950, 231 S.W.2d 784.

on the point have not been consistent. Compare, e. g., Powers v. Wilson, 2 Cir., 1940, 110 F.2d 960, with Comiskey v. Pennsylvania R. R., 2 Cir., 1956, 228 F. 2d 687, 688. Indeed, Professor Moore classifies us with the Eighth Circuit as "the most adamant expounders" of the "old doctrine of non-reviewability of decisions on motions for a new trial based on the inadequacy or excessiveness of the damages." Moore's Federal Practice, Vol. 6, p. 3834. Curiously enough, most of the cases make no reference whatever to the Seventh Amendment.

We hold that the question at issue is within our competency to decide and we shall state in some detail the reasons we think support this conclusion.

### The Supreme Court Cases

The Supreme Court cases would seem to indicate that the power exists, see Bainbrich v. Hammond Iron Works, 10 Cir., 1957, 249 F.2d 348, 349, but there is no clear and unequivocal holding to that effect. Old limitations based upon appeals by writ of error, and the fact that the motion for a new trial was not part of the trial record at common law and could not be included in the bill of exceptions,[2] have long since been eliminated by changes in the applicable statutes and rules, and more enlightened views vis-a-vis procedural obstacles. See Federal Rules Civ.Proc., Rule 75, 28 U.S. C.A.; Fairmount Glass Works v. Cub Fork Coal Co., 1933, 287 U.S. 474, 482, 53 S.Ct. 252, 77 L.Ed. 439; Harrison v.

United States, 2 Cir., 1925, 7 F.2d 259, 262.

Counsel for Dagnello rely strongly upon some general language in the opinion of Mr. Justice Brandeis in Fairmount Glass Works v. Cub Fork Coal Co., 1933, 287 U.S. 474, at pages 481–482, 53 S.Ct. 252, at page 254, but the opinion expressly disclaims, at page 485, 53 S.Ct. at page 255, any flat decision of the question of power now before us. There had been a verdict of $1 for plaintiff, and it was claimed that, even allowing for the maximum due to defendant on its counterclaim, there would still be a balance of $18,500 due to plaintiff, if there was any liability on the part of defendant to plaintiff. As we read the opinion, and as other courts have construed it,[3] the decision rested upon the supposition that the jury may well have found for defendant, and have expressed themselves in terms of a verdict of $1 for plaintiff because (287 U.S. at page 484, 53 S.Ct. at page 255) "the jury wished the costs to be taxed against the defendant." Mr. Justice Stone and Mr. Justice Cardozo dissented and took the position that the verdict must be regarded as for plaintiff on the subject of liability and that it was, as matter of law, inadequate.

The next case, Affolder v. New York, C. & St. L. R.R., 339 U.S. 96, at page 101, 70 S.Ct. 509, at page 511, 94 L.Ed. 683, decided in 1950, has been relied upon by some courts in favor of the power of review,[4] because the opinion of Mr. Jus-

Utah: Pauly v. McCarthy, 1947, 109 Utah 431, 184 P.2d 123.

Vermont: Jackson v. Rogers, 1957, 120 Vt. 138, 134 A.2d 620; Gray v. Janicki, 1953, 118 Vt. 49, 99 A.2d 707.

Virginia: Danville Community Hospital, Inc. v. Thompson, 1947, 186 Va. 746, 43 S.E.2d 882, 173 A.L.R. 525.

Washington: Kellerher v. Porter, 1948, 29 Wash.2d 650, 189 P.2d 223; Northern Pacific Ry. Co. v. Everett, 9 Cir., 1956, 232 F.2d 488.

West Virginia: Flanagan v. Mott, W. Va.1960, 114 S.E.2d 331.

Wisconsin: Makowski v. Ehlenbach, 1960, 11 Wis.2d 38, 103 N.W.2d 907; Sennott v. Seeber, 1959, 6 Wis.2d 590, 95 N.W.2d 269.

Wyoming: Borzea v. Anselmi, 1952, 71 Wyo. 348, 258 P.2d 796; Northwest States Utilities Co. v. Ashton, 1937, 51 Wyo. 168, 65 P.2d 235.

2. See Miller v. Maryland Casualty Co., 2 Cir., 1930, 40 F.2d 463, 464–465; Moore's Federal Practice, Vol. 6, p. 3825.

3. See Southern Pac. Co. v. Guthrie, 9 Cir., 1951, 186 F.2d 926.

4. Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825; Southern Pac. Co. v. Guthrie, supra; Richter and Forer, Federal Employers' Liability Act, 1952, 12 F.R.D. 13, 67; cf., Bainbrich v.

tice Clark states, "We agree with the Court of Appeals that the amount of damages awarded by the District Court's judgment is not monstrous in the circumstances of this case," citing Barry v. Edmunds, 1886, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729, from which it appears that the word "monstrous" comes from the old English case of Beardmore v. Carrington, 2 Wilson K. B. 244, 95 Eng. Rep. 790, 793, decided in 1764.

In Affolder the amount of the verdict was $95,000, and on the motion to set aside the verdict the trial judge granted a remittitur of $15,000, which was accepted by plaintiff. On appeal the Eighth Circuit adhered to its traditional rule and held, 174 F.2d 486, at page 493, "The assignment of error that the verdict is excessive is not properly addressed to this court." Accordingly, we find in the dictum above referred to no more than a hint that, possibly, if the amount of a verdict were "monstrous" a court of appeals would have the power to review as matter of law the exercise of discretion by a trial judge, on a motion for a new trial, in refusing to set aside such a verdict as excessive.

The last case in the series is Neese v. Southern Railway, 1955, 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60. That was a death case arising under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, and the verdict in favor of the administrator was for $60,000. The trial judge granted a remittitur of $10,000, and judgment was entered for $50,000. As the Fourth Circuit has for many years held that it has power to review an alleged abuse of discretion by the trial judge in refusing to set aside a verdict as excessive, see Virginian Ry. Co. v. Armentrout, 4 Cir., 1948, 166 F.2d 400, 4 A.L.R.2d 1064, the evidence was con-

sidered at some length and the conclusion arrived at that $50,000 was "far beyond the pale of any reasonable probability and entirely without support in the record," and the case was remanded for a new trial "confined to the issue of damages." Southern Railway Co. v. Neese, 4 Cir., 1954, 216 F.2d 772, 776. In the following brief Per Curiam the Supreme Court reversed:

"We reverse the judgment of the Court of Appeals * * * without reaching the constitutional challenge to that court's jurisdiction to review the denial by the trial court of a motion for a new trial on the ground that the verdict was excessive. Even assuming such appellate power to exist under the Seventh Amendment, we find that the Court of Appeals was not justified, on this record, in regarding the denial of a new trial, upon a remittitur of part of the verdict, as an abuse of discretion. For apart from that question, as we view the evidence we think that the action of the trial court was not without support in the record, and accordingly that its action should not have been disturbed by the Court of Appeals."

We infer from this that the essence of the problem before us now is not whether the statute creating the appellate powers of the federal Courts of Appeals is not sufficiently broad,[5] but whether the Seventh Amendment should be construed as forbidding this particular species of appellate review as a "reexamination" of the "facts" otherwise than "according to the rules of the common law." This question the Supreme Court has expressly reserved for future determination. See Neese v. Southern

---

Hammond Iron Works, supra; Wetherbee v. Elgin, Joliet & Eastern Ry., 7 Cir., 1951, 191 F.2d 302, 310.

5. 28 U.S.C. Section 2106.
    It provides:
    "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or re-

verse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

Railway, supra. And there the matter stands for the present.

### The Rulings in Other Circuits

After some changes of position, mostly by way of overruling earlier cases denying the power of review, the First, Third, Fourth, Sixth, Seventh, Ninth, Tenth and the District of Columbia Circuits "now recognize that they may reverse a judgment even though the only basis for review is the inadequacy or excessiveness of the verdict."[6] Moore, Vol. 6, pp. 3836–9. Recently, the Fifth Circuit appears to agree with the others. Whiteman v. Pitrie, 5 Cir., 1955, 220 F. 2d 914; Phoenix Indemnity Co. v. Givens, 5 Cir., 1959, 263 F.2d 858, 863; cf. Sunray Oil Corp. v. Allbritton, 5 Cir., 1951, 187 F.2d 475. Even the Eighth Circuit has started to wobble a bit. See St. Louis Southwestern Ry. Co. v. Ferguson, 1950, 182 F.2d 949.

We need not pause to consider in detail the rules formulated in the various Circuits to implement the exercise of the power of review. That there is, at least on the surface, a wide difference of opinion neëd not surprise us. Common phrases are such as: "grossly excessive," "inordinate," "shocking to the judicial conscience," "outrageously excessive," "so large as to shock the conscience of the court," "monstrous," and many others. See, e. g., Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F. 2d 825, 830; Whiteman v. Pitrie, supra, 220 F.2d at page 919; Sunray Oil Corp.

v. Allbritton, 5 Cir., 1951, 188 F.2d 751; Russell v. Monongahela Ry., 3 Cir., 1958, 262 F.2d 349, 352; United States v. Grigalauskas, 1 Cir., 1952, 195 F.2d 494, 498; Ballard v. Forbes, 1 Cir., 1954, 208 F.2d 883, 888; Covey Gas & Oil Co. v. Checketts, 9 Cir., 1951, 187 F.2d 561, 563. In some cases the very amount of the verdict is said to justify the inference that the verdict was brought about by passion or prejudice,[7] although it seems to us that this is just another way of saying the verdict is too high. Chief Judge Parker in the Fourth Circuit case of Virginian Ry. Co. v. Armentrout, 1948, 166 F.2d 400, 407, 4 A.L.R.2d 1064, states that the discretion exercised by the trial judge must be "sound" and not "arbitrary," and that it must be "exercised in the light of the record in the case and within the limits prescribed by reason and experience."

### The Seventh Amendment

The Seventh Amendment reads:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

From the very early days of the Republic trial judges seem to have assumed they had power to set aside verdicts and grant new trials on the sole ground that

---

6. First Circuit: Ballard v. Forbes, 1954, 208 F.2d 883.

    Third Circuit: Wooley v. Great Atlantic & Pacific Tea Co., 1960, 281 F.2d 78; Trowbridge v. Abrasive Co. of Philadelphia, 1951, 190 F.2d 825.

    Fourth Circuit: Virginia Ry. Co. v. Armentrout, 1948, 166 F.2d 400, 4 A.L.R. 2d 1064.

    Sixth Circuit: Sebring Trucking Co. v. White, 1951, 187 F.2d 486.

    Seventh Circuit: Bucher v. Krause, 1952, 200 F.2d 576, certiorari denied Krause v. Bucher, 1953, 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404.

    Ninth Circuit: Siebrand v. Gossnell, 1956, 234 F.2d 81; Southern Pac. Co.

v. Guthrie, 1951, 186 F.2d 926; Department of Water and Power of City of Los Angeles v. Anderson, 1938, 95 F.2d 577; Cobb v. Lepisto, 1925, 6 F.2d 128.

    Tenth Circuit: Smith v. Welch, 1951, 189 F.2d 832.

    D. C. Circuit: Boyle v. Bond, 1951, 88 U.S.App.D.C. 178, 187 F.2d 362; cf. Hulett v. Brinson, 1956, 97 U.S.App.D.C. 139, 229 F.2d 22.

7. See Southern Pac. Co. v. Zehnle, 9 Cir., 1947, 163 F.2d 453; Snowden v. Matthews, 10 Cir., 1947, 160 F.2d 130; Earl W. Baker & Co. v. Lagaly, 10 Cir., 1944, 144 F.2d 344, 154 A.L.R. 1098.

they were excessive,[8] despite the fact that common law trial judges in England, prior to the adoption of the Seventh Amendment in 1791, exercised no such power, as motions for new trials were not addressed to the trial judges.[9] And it must be borne in mind that the federal as well as the state judges in 1791 were familiar with English and Colonial precedents. So far as we are aware, the first occasion for authoritative comment to serve as a precedent arose in 1822 when Mr. Justice Story, sitting on circuit, authorized a remittitur in Blunt v. Little, Fed.Cas.No.1,578, 3 Mason 102. From that time to this, federal trial judges have had the unchallenged power to set aside verdicts as excessive and grant new trials, and they have also exercised the salutary power to deny the motion for a new trial provided plaintiff accepted a reduced amount of recovery on remittitur. Until the landmark case of Dimick v. Schiedt, 1935, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, involving the question of whether additur was permissible, there appears to have been no extended research into the practices and procedures of the English courts at the time the Seventh Amendment was adopted in 1791.

As might have been anticipated, the details of trial practice in England and in the United States were so different that the majority in Dimick v. Schiedt, even though holding that the Seventh Amendment "has in effect adopted the rules of the common law in respect of trial by jury as these rules existed in 1791" (293 U.S. at page 487, 55 S.Ct. at page 301) had to rely upon substantial

equivalents. Thus the majority in effect held that as there were English precedents for remittiturs and none such were found for additurs, the remittitur practice was proper under the Seventh Amendment but the additur practice was not.[10]

The famous dissent by Mr. Justice Stone, concurred in by Chief Justice Hughes, Mr. Justice Brandeis and Mr. Justice Cardozo took a broader view of the issue. Thus the dissent reads in part, 293 U.S. at pages 490–491, 55 S.Ct. at page 302:

> "The Seventh Amendment commands that 'in suits at common law,' the right to trial by jury shall be preserved and that 'no fact tried by a jury shall be otherwise reexamined by any court of the United States, than according to the rules of the common law.' Such a provision of a great instrument of government, intended to endure for unnumbered generations, is concerned with substance and not with form. There is nothing in its history or language to suggest that the Amendment had any purpose but to preserve the essentials of the jury trial as it was known to the common law before the adoption of the Constitution. For that reason this Court has often refused to construe it as intended to perpetuate in changeless form the *minutiae* of trial practice as it existed in the English courts in 1791. From the beginning its language has been regarded as but subservient to the single purpose of the Amendment, to preserve the essentials of

---

8. Dimick v. Schiedt, 1935, 293 U.S. 474, 488, 55 S.Ct. 296, 79 L.Ed. 603.

9. Dimick v. Schiedt, supra, 293 U.S. at pages 491–492, and note 2, 55 S.Ct. at page 303; Moore's Federal Practice, Vol. 6, p. 3828; Riddell, New Trial at the Common Law, 26 Yale L.J. 49 (1916); Blume, Review of Facts in Jury Cases— The Seventh Amendment, 20 J.Am.Jud. Soc'y 130, 131 (1936); Comment, Federal Appellate Review of Excessive or Inadequate Damage Awards, 28 Fordham L.Rev. 500, 503 (1959); Comment, Fed-

eral Review of Excessive Verdicts, 30 Texas L.Rev. 242, 245 n. 27 (1951); Comment, 32 Mich.L.Rev. 387, 391 (1934); 65 Harv.L.Rev. 1064, 1065 (1952).

10. While the Court in Dimick v. Schiedt concluded that there was some English precedent for remittur, it did not state whether in England the trial judge had the power to grant the remittitur. Since the English trial judge had no power to grant a new trial, it is to be assumed that he could not grant a remittitur.

804

the jury trial in actions at law, serving to distinguish them from suits in equity and admiralty, see Parsons v. Bedford, 3 Pet. 433, 446, 7 L.Ed. 732, and to safeguard the jury's function from any encroachment which the common law did not permit.

Thus interpreted, the Seventh Amendment guarantees that suitors in actions at law shall have the benefits of trial of issues of fact by a jury, but it does not prescribe any particular procedure by which these benefits shall be obtained, or forbid any which does not curtail the function of the jury to decide questions of fact as it did before the adoption of the Amendment. It does not restrict the court's control of the jury's verdict, as it had previously been exercised, and it does not confine the trial judge, in determining what issues are for the jury and what for the court, to the particular forms of trial practice in vogue in 1791."

■ It is our view and we hold there is no constitutional obstacle to the exercise by a federal Court of Appeals of the power to review the exercise of discretion by the trial judge in refusing to set aside a verdict for excessiveness, and to resort to remittitur in proper cases, because: (1) if, as concededly is the case, a trial judge may set aside a verdict for excessiveness, or direct remittitur, even though he did not have the power to do so at common law, without infringing the Seventh Amendment, it should follow that an abuse of discretion in failing to take such action can be reviewed on appeal without doing violence to the Amendment; (2) there is English precedent prior to 1791 for appellate review of the amount of the verdict, in respect of excessiveness; and (3) adopting the views of Stone, Hughes, Brandeis and Cardozo, the exercise of this appellate power of review will "preserve the essentials of the jury trial as it was known to the common law before the adoption of the Constitution," and will

not "curtail the function of the jury to decide questions of fact as it did before the adoption of the Amendment."

We think it of prime significance that all the lawyers and judges, who were familiar with English and Colonial precedents, should have acquiesced in the exercise by the early federal trial judges of the power to set aside verdicts for excessiveness. There was general agreement on the necessity of preserving trial by jury as one of the surest defenses against tyranny, oppression, privilege and prerogative. Had it been thought that the exercise of this power by the federal trial judges weakened the jury system there would have been a resounding protest.

Over a hundred years later the English precedents were studied with care. The fruits of this research appear in the majority and the dissenting opinions in Dimick v. Schiedt, supra, and in the dissenting opinions of Judge Holmes in the two Fifth Circuit decisions in Sunray Oil Corp. v. Allbritton, 1951, 187 F.2d 475, 477, and 1951, 188 F.2d 751, 752. The facts are simple enough, they were known all the time by legal scholars and students of procedure. Juries were regularly used in the courts of Kings Bench, Common Pleas and Exchequer. But motions for new trials were not addressed to the judges who presided over the trials. Instead, such motions were made at Westminster and heard en banc, by four of the judges, and the trial judge in a particular case might or might not be one of the four. There was no appeal on the point from the decision of the judges en banc. The historical evidence establishes beyond shadow of doubt that excessiveness in the amount of the verdict was commonly urged as a reason for the direction of a new trial, and many new trials were ordered for that reason alone. If it is deemed necessary to find English precedent prior to 1791 for appellate review of excessiveness, we think the practice at Westminster just referred to furnishes such precedent, as it was not the trial judge, but a group of judges sitting en banc and exercising functions analo-

gous to those of an appellate tribunal, who determined the question of excessiveness.[11] Nor does it appear that they found the question one of extraordinary difficulty.

■ We are frank to say, however, that we find the most compelling and persuasive arguments favorable to the view that the Seventh Amendment is no bar to present day appellate review of the rulings of trial judges denying new trials for excessiveness of verdicts, in the reasons given by Stone, Hughes, Brandeis and Cardozo above quoted from Mr. Justice Stone's dissent in Dimick v. Schiedt. The jury does not function alone, but in cooperation with the judge presiding over the trial.[12] For centuries, in England and in America, this has been so. Without judicial supervision over what Blackstone called the "misbehavior" of juries,[13] a trial by jury would lack one of "the essentials of the jury trial as it was known to the common law before the adoption of the Constitution." None of these essentials would be in the slightest degree altered or disturbed by the judge's supervision of the trial or by the appellate review of the rulings that in the aggregate constitute such supervision. See Moore's Federal Practice, Vol.

6, pp. 3827–8 See also Galloway v. United States, 1943, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458.

Thus we conclude that the Seventh Amendment is no bar, and this is in accord with the view expressed by Judge Learned Hand, writing for this Circuit in 1930, in Miller v. Maryland Casualty Co., 40 F.2d 463, 465.

### The Second Circuit

As for the precedents, it will suffice to say that for many years we held there was no power to review the question at issue. E. g., Press Pub. Co. v. Gillette, 1915, 229 F. 108; Ford Motor Co. v. Hotel Woodward Co., 1921, 271 F. 625; Miller v. Maryland Casualty Co., 1930, 40 F.2d 463; Jacque v. Locke Insulator Corp., 1934, 70 F.2d 680; Searfoss v. Lehigh Valley R. Co., 1935, 76 F.2d 762; Powers v. Wilson, 1940, 110 F.2d 960; Nagle v. Isbrandtsen Co., 1949, 177 F.2d 163; Kennair v. Mississippi Shipping Co., 1952, 197 F.2d 605; Stevenson v. Hearst Consol. Publications, 1954, 214 F.2d 902; Maher v. Isthmian Steamship Co., 1958, 253 F.2d 414. The first indication of a change of view came in Comiskey v. Pennsylvania R. R., 1956, 228 F.2d 687, 688, followed by Dellaripa

11. The English practice prior to the adoption of the Seventh Amendment and the light it throws on the problem at hand are also discussed in Dimick v. Schiedt, supra, 293 U.S. at pages 491–492, 55 S. Ct. at page 303; Moore's Federal Practice, Vol. 6, pp. 3827–3828; Hinton, Power of Federal Appellate Court to Review Ruling on Motion for New Trial, 1 U.Chi.L.Rev. 111 (1933); Riddell, New Trial at the Common Law, 26 Yale L.J. 49 (1916); Blume, Review of Facts in Jury Cases—The Seventh Amendment, 20 J.Am.Jud.Soc'y 130 (1936); Note, Appealability of Rulings for New Trial in the Federal Courts, 98 U.Pa.L.Rev. 575 (1950); Comment, Federal Appellate Review of Excessive or Inadequate Damage Awards, 28 Fordham L.Rev. 500 (1959); Comment, Federal Review of Excessive Verdicts, 30 Texas L.Rev. 242 (1951); Comment, 32 Mich.L.Rev. 387 (1934); 65 Harv.L.Rev. 1064 (1952).

12. See the following comments of Mr. Justice Gray in Capital Traction Co. v.

Hof, 1899, 174 U.S. 1, 13–14, 19 S.Ct. 580, 585, 43 L.Ed. 873:

" 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of twelve men before an officer vested with authority to cause them to be summoned and empanelled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and * * * to set aside their verdict if, in his opinion, it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion."

13. Blackstone's Commentaries, Vol. 3, p. 388.

v. New York, N. H. & Hartford R. R., 1958, 257 F.2d 733.

■ It is strange that the rule of non-reviewability should have hung on so long, despite the practically unanimous protests of text writers and commentators. See Moore's Federal Practice, Vol. 6, Para. 59.08[6]; Hinton, Power of Federal Appellate Court to Review Ruling on Motion for New Trial, 1 U.Chi.L. Rev. 111 (1933); Blume, Review of Facts in Jury Cases—The Seventh Amendment, 20 J.Am.Jud. Soc'y 130 (1936); Note, Appealability of Rulings on Motions for New Trial in the Federal Courts, 98 U.Pa.L.Rev. 575 (1950); Comment, Federal Appellate Review of Excessive or Inadequate Damage Awards, 28 Fordham L.Rev. 500 (1959); Comment, Federal Review of Excessive Verdicts, 30 Texas L.Rev. 242 (1951); 65 Harv.L.Rev. 1064 (1952). The claim that such review was too difficult has been conclusively disproved by the fact that appellate courts throughout the nation perform this function daily and with satisfaction to the public. The ends of justice are served thereby. And so we hold we have the power to review the order of a trial judge refusing to set aside a verdict as excessive. If we reverse, it must be because of an abuse of discretion. If the question of excessiveness is close or in balance, we must affirm. The very nature of the problem counsels restraint. Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded,[14] so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law. Virginian Ry. Co. v. Armentrout, supra. This betokens no lack of confidence in the jury system or in the trial judges.

We do not rest our decision upon the revision of the Judicial Code in 1948, when the statutory prohibition contained in Section 22 of the Judiciary Act of 1789 to the effect that no judgment should be reversed "for any error in fact," and carried over into Section 1011 of the Revised Statutes and 28 U.S.C. Section 879 (1946 ed.), the successors of old Section 22 above referred to, was deleted from Section 2105 of the new Judiciary Code (28 U.S.C. Section 2105). The Revisers' Notes to Section 2105, H. R.Rep. No. 308, p. A173, 80th Cong., 1st Sess. 1947), clearly indicate that the words "for any error in fact" were omitted solely for the purpose of removing the mistaken impression that the facts could not be reviewed in non-jury cases. See 65 Harv.L.Rev. 1064, 1065 (1952). As above indicated, we think here we are reviewing a question of law.

### The Evidence Supporting the Verdict

■ We shall now examine the evidence upon which the verdict was based, in order to decide whether the award of $97,000 for "pain and suffering and loss of limb" is so high that it would be a miscarriage of justice to permit it to stand. As we find there was no abuse of discretion by Judge Weinfeld, we shall affirm the judgment and order appealed from, and it is not necessary for us to consider the collateral point, argued by appellee, that we should confine our review to the gross amount of the verdict, and disregard the jury's specifications as surplusage.

After his accident Dagnello had to wait from one half hour to forty-five minutes before an ambulance arrived to take him to Kings County Hospital in Brooklyn. During that time the firemen on the switching crew on which Dagnello had been working placed a tourniquet around

14. Delaney v. New York Cent. R. Co., D.C.S.D.N.Y.1946, 68 F.Supp. 70; Lopoczyk v. Chester A. Poling, Inc., D.C. S.D.N.Y., 60 F.Supp. 839, affirmed 2 Cir., 1945, 152 F.2d 457.

his leg. His pain and suffering must have been intense.

When he arrived at Kings County he was seen by Dr. Marvin L. Gleidman, a resident in surgery. Dr. Gleidman testified that when he first saw Dagnello he found that his left leg had been amputated below the knee, and that a jagged bone was protruding from the amputation. Skin and tissue were ingrained with mud, dirt, and oil, and Dagnello was cold, slightly hysterical, and had a very rapid pulse. His blood pressure, however, was good. Because dead tissue, which if allowed to remain could cause kidney poisoning, was present, Dr. Gleidman decided to operate immediately.

Before the operation Dagnello was given pre-operative medication and a general anesthesia. During the operation Dr. Gleidman was forced to amputate above the knee, in part because the knee was crushed. He did not close the amputation but left it open, because there was not sufficient skin left to form a serviceable stump. After the operation Dagnello was placed in a traction device which stretched the skin, so that enough skin would become available to form a stump. He remained in this traction device until he was transferred to another hospital on March 30, 1959. This traction device pulled on Dagnello's leg and was painful. Moreover, during the remainder of his stay at Kings County, Dagnello suffered phantom limb pain. In fact, although it diminished in frequency, this pain remained with him until the time of trial, despite the fact that he had undergone ultrasonic treatments to alleviate it. And there was competent medical testimony that such pain persisted for long periods or indefinitely in most cases.

On March 30, 1959, Dagnello was moved to St. Johns Episcopal Hospital, also in Brooklyn. Since the traction device which had been used at Kings County could not be transported, he was fitted with a portable traction device known as a Thomas Splint for his trip. He was kept in this device for two more days after his arrival at St. Johns. This de-

vice impinged on Dagnello's groin and caused him pain there. On April 1, 1959, Dr. Gerald W. Shaftan operated upon him to close his amputation and to form a stump. To form a good stump he was forced to remove two more inches of bone. After the operation a sandbag was maintained on Dagnello's leg in order to prevent his thigh muscles from pulling up the stump. This too was painful.

Within three days after the operation Dagnello was given crutches, and he was discharged on April 7, 1959. On April 10 and 13 he visited Dr. Shaftan at his office. On April 10 Dr. Shaftan removed the sutures and cauterized the wound with silver nitrate. On the 13th he again cauterized the wound.

By June 29, 1959 Dr. Shaftan concluded that considering the fact that Dagnello had suffered what might have been a lethal injury, he had made "a superb recovery," and that he was both physically and psychologically suited for the use of an artificial limb.

Near the end of April, 1959, Dr. Shaftan discharged Dagnello to the care of a Dr. Benton in order that he might be fitted for and taught how to use an artificial limb. Dr. Benton also gave Dagnello ultrasonic treatments for his phantom limb pain. Dagnello was in fact fitted with an artificial limb, but because his stump was sensitive and not weight-bearing the limb was one of the "suction" type. Such a limb puts no pressure on the end of the stump but encloses it on all sides.

Dagnello could not use his artificial limb for long periods of time because of sensitivity, especially on the inner side of the stump, phantom limb pain, and pain in the lower back. Upon examination by Dr. Shaftan and Dr. Bernard Mintz, an orthopedic specialist, it was found that he had what is called a "dog ear" on the inner side of the stump. In Dagnello's case this was a little square piece of surplus tissue sticking out at the suture line. Since it was felt that this "dog ear" might be contributing to Dagnello's pain,

a third operation was performed when on November 2, 1959 Dr. Shaftan excised it.

At the time of the accident Dagnello was twenty-nine years old, married and had one child, with another on the way. He will suffer considerable pain for the rest of his life. His normal recreational activities will no longer be possible. The disfigurement itself was a proper subject for the jury's consideration.

On this record we cannot say it would be a denial of justice to permit this verdict to stand.

Affirmed.